Commonwealth *v.* Flax, Appellant.

Argued May 16, 1938. Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Lemuel B. Schofield,* with him *Daniel Greenfield* and
*Thomas D. McBride,* for appellant.

*Harry Felix,* Assistant District Attorney, with him
*Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, June 30, 1938:

This is an appeal by defendant, Abraham Flax, from
the judgment and sentence of the Court of Oyer and
Terminer of the County of Philadelphia, entered upon
a verdict of murder in the second degree. The Common-
wealth alleges that on the night of July 8, 1937, Abra-
ham Flax fatally shot his brother, Morris Flax, in the
abdomen, the victim dying three days later. Defendant
was charged in two bills of indictment, one with mur-
der, and the other with voluntary and involuntary man-
slaughter.

The brothers conducted a provision business in a
store located at 616 South 18th Street, Philadelphia.
They lived with their respective families in apartments
on the second and third floors of the building.

Ida G. Flax, the deceased's wife, and the only eye-witness who testified for the Commonwealth, stated in substance that on the night in question defendant entered the store and passed through to the stock room in the rear, where he remained for five minutes, that he then "came out and stood by the candy counter" for another five minutes, that he then departed with his father in an automobile, that upon returning shortly thereafter, he remained in the car for some time and then re-entered the store. She further testified that defendant approached her husband and herself as they stood behind the cake counter and said to her husband: "How much trouble do you want out of me?", and then shot him and threw him on the floor, and, while he had him on the floor, he fired two more shots wildly. She added: "My husband finally got the gun away from him, chased him out, and he [defendant] ran out and got in the machine." She also testified that, while the brothers were struggling, she went to phone for help, that she heard her husband fire one shot outside but did not see him do it, and that her husband went to the hospital. At the hospital, according to her testimony, the defendant said: " 'There she is, I am sorry I didn't shoot her,' " and her husband "hollered 'enough' and said that he [defendant] was the man shot him." On cross-examination she admitted that her husband had his hand on the gun during the struggle on the floor during which the two shots were fired. For the purpose of impeaching her testimony, she was questioned on cross-examination as to a civil suit involving the proceeds of a life insurance policy containing a double indemnity clause for accidental death. She admitted that she was plaintiff in that case but denied knowledge of the fact that the suit involved the sum of $1,000 and that to succeed in that suit she would have to prove that her husband had not provoked an assault which resulted in his death.

Several police officers testified on behalf of the Commonwealth. A motorcycle policeman testified that he had approached to within twenty feet of the store when he heard three shots and saw defendant run from the store and enter an automobile, that the defendant refused to stop at his command, that he pursued and apprehended him. The witness said: "I asked him what he did and he told me he just shot a man in the store." He said that he took defendant to the hospital where the wounded man identified defendant as his brother and asserted that defendant had shot him, that the defendant made no comment as to this, and that "he said he would not talk until he got a lawyer." The witness also testified that when defendant saw the deceased's wife, he hollered: "There she is; I should have shot her." A police officer testified that he arrived at the hospital "a minute after Morris," that he found the revolver on the ground where Morris had dropped it, containing four empty shells and one loaded shell. On cross-examination he said that the bullet which had not been fired had "indications of being struck by the firing pin." Another police officer testified that he asked defendant in the hospital "whether he had done any shooting" and he replied: " 'Yes, I shot my brother, Morris Flax.' I asked him, 'Why did you shoot your brother?' He said, 'Oh, domestic difficulty.' " The witness testified further that Morris Flax, upon being questioned in the presence of defendant, identified the latter as his brother and stated: "He shot me. He threatened to shoot me for quite some time." A doctor who attended Morris Flax at the hospital testified that he died three days after admittance from "toxemia, super-induced by infection from the gunshot wound."

Defendant, aged 42, testified that on the night of the shooting he returned to the store about 10 p. m. after he and his father had made some deliveries, that he and his father went into the store, that his brother Morris rang up the sales in the cash register, that he then said

to his brother: " 'What about the money you owe the store, $145?' My brother said, 'What the hell is the matter with you,' and 'do you want to make anything out of it; are you mad?' So I tried to forget it." He said that his father was in the store at the time. He then left the store without replying to his brother. He talked to his father outside in front of the store for some time. He re-entered the store to go upstairs to find his wife. He said: "I came in the middle of the store. My brother came out and said: 'I have been going after you for a long time. I will fix you now, damn you.' " He testified that his brother was a larger man than he was, that he (the defendant) went to the stock room and got the revolver from the safe. He said: "We had the revolver over thirty years. I was coming out toward the front of the store, just with the intention of scaring my brother. I had the revolver in my hand, and had it pointing down toward the floor." He testified that his brother then struck him and said to him: " 'Damn you, I will get you,' and 'I have been going after you a long time.' " The witness said that "when he fell down with that punch he had given me, I said, 'I don't want the gun to go off. We can get out of this; I will forgive you.' He says, 'I will fix you right.' He grabbed the gun with his two hands. I was scared and worried then. He had his two hands on the gun. I was half-way on the floor. Then he grabbed—I had my hands on it; there were four hands on the gun, and we were both struggling with the gun." After testifying how they were struggling with both their hands on the gun, he said: "There was one shot and another shot fired. I didn't know that anyone had been hit, because I didn't know what was happening; we were going around, naturally, while struggling, and we were laying on the floor, face to face, with the four hands on the gun; side by side. When I felt that my brother Morris had got the gun, I was scared then. I jumped up and ran out the door. . . . My brother jumped up and followed me out and

he fired at me going out the door and he fired again, and I tried to get away from my brother. . . . I went around in front of my car to get away from him, I went around the back. As I came to the driver's seat, the door was closed. . . . I shut the door and sat down to get away from my brother, and he had the gun—the glass in the door was down—he pointed the revolver at my head, and I felt like I am going now. . . . He kept on pulling the trigger and saying, 'I'll fix you,' but it didn't go off." Defendant said that he then started the car and drove up 18th Street. He testified that he was apprehended a few blocks farther on by a motorcycle officer, that the first time he knew that anything had happened to his brother was when someone had said that his brother "ran to the hospital," and that he drove to the hospital with the motorcycle officer. He said that when one of the police officers asked his brother: "Is this the man [meaning defendant]?" his brother replied, "Yes, that is him." He testified further that when his sister-in-law came in later all that he said to her was "There is the cat responsible for our trouble." On cross-examination he testified that his sister-in-law was present when her husband hit him but not when the shooting occurred.

Louis Flax, father of the two men involved, testified in behalf of the defendant. He said: "I didn't see anything until I heard two shots fired: . . . Then I turned around, and I seen them both laying on the floor—both boys laying on the floor. . . . Abe [defendant] jumped up and went out of the store." He testified that Morris had the gun, ran out of the store after defendant, and fired two shots outside. He further testified: "Abe ran around the machine; the machine was standing out at the curb. He said he wanted to start the car to get away. Morris pointed the gun at him and tried to shoot him right at his head, but it didn't go off. So Abe went away, and Morris ran to the hospital, with the gun." He also said that after he heard the two shots and went into the store, he didn't see Mrs. Flax, the deceased's wife, there.

Another witness in behalf of the defendant testified that immediately prior to the shooting he had been in the yard behind his father's shop, next door to the Flax store, and that he "heard a tussling," turned and walked to the Flax window where he saw the brothers on the floor "tussling," that "the gun went off, and another shot," after which Morris pursued defendant out of the store, firing twice, and that when defendant entered his car, Morris placed the gun at defendant's head and pulled the trigger but no shot was fired. On cross-examination he testified that the two shots fired by Morris as he left the store were fired in the air. A brother of this witness testified that he was in the tailor shop, heard "about one" shot, ran outside in time to see Morris fire two shots in the air as he pursued defendant, and that Morris pointed the gun at the defendant just before the latter drove off in his car. The father of these two witnesses testified that he arrived in time to see Morris emerge from the store, fire twice in the air, and point the gun at defendant's head without effect.

A woman witness, called on behalf of defendant, testified that she arrived at the scene immediately following the sound of two shots. She said: "As I opened the door to go in the store, Mrs. Flax stepped down from off the steps going upstairs. . . . I said: 'Mrs. Flax, what in the world has happened?' She said, 'I don't know; I don't know. Where is Morris? Call the cops.' . . . She went to the front door and somebody told her that Morris had gone to the hospital." The witness said that upon Mrs. Flax's request she accompanied her to the hospital and that when defendant saw them he said: "That is the cat [meaning Mrs. Flax] that caused all the trouble. It should have been her instead of my brother."

Seven character witnesses testified to the good reputation of the defendant. The testimony of 29 more was offered and accepted by agreement.

The jury returned a verdict of murder in the second degree. Defendant's motion for a new trial was dismissed and he was sentenced to undergo imprisonment in the penitentiary for a term of 10 to 20 years. This appeal followed.

The first assignment of error reads as follows: "The learned trial judge erred in withdrawing from the consideration of the jury the crime of voluntary manslaughter, as follows: 'I, therefore, instruct you that there is no evidence in this case which would justify you, if you believe the defendant guilty of unlawfully taking the life of his brother, in bringing in a verdict of a lesser grade of homicide than murder of the first or second degree.' "

In *Com. v. Carroll*, 326 Pa. 135, 191 A. 610, we reiterated the rule frequently laid down by this court: "In any case where there is evidence which might lead a jury to accept defendant's theory of voluntary manslaughter the jury must be given an opportunity to find such a verdict. . . . 'The cases in which the omission or refusal of the court to instruct as to manslaughter has been sustained were cases free from possible doubt. . . . If there is any evidence that would reduce the crime to manslaughter, the defendant is entitled to have the jury instructed upon the subject.' "

In *Com. v. Colandro*, 231 Pa. 343, 80 A. 571, this court said: "It was error to tell the jury that self-defense was the only issue, and to eliminate the possibility of manslaughter; and again, it was error to say that it was necessary for the defendant to satisfy the jury that his version of the shooting was correct. In a murder case the jury are not bound to accept the version of the Commonwealth or that of the defense; it is their duty to consider all the testimony and to make up their minds therefrom as to the facts. It was possible in this case that the jury might have found that there was a certain amount of truth in the evidence produced by the Commonwealth and some truth in that produced by the de-

fense, but that neither side was wholly to be believed. On this theory, the jury might have believed the story of the threats to take defendant's life, and that he was put in great fear by such threats; and that when he saw Rocco [the deceased] coming toward him it raised a passion of terror in his mind, and he shot under the control of that passion." In that case we quoted from 21 Am. & Eng. Ency. of Law (2d ed.), 172, as follows: "Voluntary manslaughter is a homicide intentionally committed under the influence of passion." Page 173: "The term 'passion' as here used includes both anger and terror, provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected." "Passion, as used in a charge defining manslaughter . . . means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection": 6 Words & Phrases, p. 5227. "Although anger is the passion usually existing in cases of this class, yet any other passion, as sudden resentment or terror, rendering the mind incapable of cool reflection, may reduce the grade of the crime": 21 Cyc. 737.

The record in this case furnishes evidence from which the jury, if it found that a criminal homicide had been committed, would have been warranted in finding that it rose no higher than that of voluntary manslaughter. According to defendant's testimony, above reviewed, the deceased when confronting defendant used language and indulged in conduct well calculated to raise in the latter apprehensions of grievous or fatal bodily harm. Defendant, after recounting his brother's words and acts, declared: "I was scared and worried then." This testimony, if credited by the jury, might well lead it to believe that defendant if he discharged the gun intentionally did so under the influence of well grounded fear or terror. If he did, he was at most guilty of no higher degree of crime than voluntary manslaughter.

The trial judge in his charge to the jury said: "With respect to manslaughter, I deem it unnecessary to instruct you upon that lower grade of unlawful homicide, because if the version of this shooting, as told by the witnesses for the Commonwealth, is believed by you to be true, the offense in law would be murder, and there is nothing in that version of the transaction which would justify you in finding him guilty of the lower degree of manslaughter. On the other hand, the version of the occurrence as told by the defendant and his witnesses, is, in substance that the shooting in this case was purely accidental. . . . In other words, according to the version of this occurrence as told by the defense, no crime was committed by this prisoner, whereas if the occurrence happened in the manner and under the circumstances detailed by the witnesses for the Commonwealth, it would be murder in one or other of its degrees."

The foregoing instruction is clearly at variance with the rule laid down in *Com. v. Colandro,* supra, in which we said that the jury is not bound to accept the version either of the Commonwealth or that of the defense, and that they are to make up their own minds from the facts exactly what was the true situation at the time of the homicide.

When a defendant in a murder indictment enters a plea of "not guilty," the burden is put upon the Commonwealth to prove him guilty beyond a reasonable doubt, either of murder in the first degree, *or* murder in the second degree, *or* voluntary manslaughter, *or otherwise* the Commonwealth must suffer an acquittal. The defendant is under no obligation to take the stand and deny or explain or attempt to excuse the homicide, but if he does, and he explains or attempts to excuse it on the theory of self-defense or of an accidental killing, and even though the theory thus advanced by him in his testimony is rejected by the jury, the burden still remains on the Commonwealth to prove the essential ingredients of at least one of the crimes charged in the indictment

before it is entitled to a conviction. If the specific intent to take life is not proved beyond a reasonable doubt, the jury cannot find the defendant guilty of murder in the first degree. If a malicious killing is not proved beyond a reasonable doubt, the jury cannot find defendant guilty of murder in *either* first *or* second degree. If the evidence does not warrant the conviction of defendant of murder in either the first or second degree, the jury must then consider whether or not the essentials of the crime of voluntary manslaughter are present, except in those cases where it is clear that there is no evidence and no permissible inference from the evidence, pointing to the offense of voluntary manslaughter, and the court then so charges the jury.

The crime of voluntary manslaughter consists of an intentional and unlawful killing of a human being without malice, either express or implied, but committed under the immediate influence of sudden passion. Just as malice is the impelling power of murder, either anger or rage or resentment or terror is the impelling power of voluntary manslaughter. The sudden passion which will reduce an unlawful killing to voluntary manslaughter must be due to a legally adequate provocation. While there is no such thing as justifiable or excusable malice, the law does recognize justifiable or excusable passion, whether that passion be anger, rage, resentment or terror. It is legally justifiable or excusable when there is a legally sufficient cause for it. The law regards with some tolerance an unlawful act impelled by a justifiably passionate heart, but has no toleration whatever for an unlawful act impelled by a malicious heart.

In the instant case there was evidence which, if credited by the jury, would justify the jury's finding that there was at the time of the homicide either justifiable anger, rage, resentment or terror in the heart of this defendant. If, while under the influence of any of these adequately provoked passions, defendant inflicted upon

the deceased the injuries which resulted in his death, he would not be guilty of murder and it was the duty of the court so to instruct the jury. It is only in those cases where on a trial for murder there is no evidence which in the remotest degree points directly or by inference to the offense of manslaughter, that the court commits no error in instructing the jury that a verdict of guilty of manslaughter would not be warranted. See *Com. v. Yeager,* 329 Pa. 81, 85, 196 A. 827, and *Com. v. Miller,* 313 Pa. 567, 170 A. 128. The first assignment of error is sustained.

The second assignment of error reads as follows: "The learned trial judge erred in withdrawing from the consideration of the jury the crime of involuntary manslaughter, as follows: 'I, therefore, instruct you that there is no evidence in this case which would justify you, if you believe the defendant guilty of unlawfully taking the life of his brother, in bringing in a verdict of a lesser grade of homicide than murder of the first or second degree.' "

The grade of culpable homicide known as involuntary manslaughter includes all such killings as result unintentionally and without malice from the commission of unlawful but *non*felonious acts not naturally tending to cause death or great bodily harm, or the negligent performance of acts which are not unlawful per se, or by the negligent omission to perform a legal duty. The unlawfulness of the act in connection with which the killing occurs is the element which distinguishes involuntary manslaughter from a killing excusable as by accident or misfortune.

Homicide by misadventure (which is excusable) is the accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct. "Three elements enter into the defense of excusable homicide by misadventure: [1] The act resulting in death must be a lawful one;

[2] It must be done with reasonable care and due regard for the lives and persons of others; and [3] the killing must be accidental and not intentional, or without unlawful intent, or without evil design or intention on the part of the slayer. All these elements must concur and the absence of any one of them will involve in guilt. Even though the homicide is unintentional, it is not excusable where it is the result or incident of an unlawful act, such as pointing or presenting a gun, pistol or other firearm at another person in such a manner as to constitute an offense under the laws of the state, or unlawfully striking another with an intent to hurt, although not with an intent to kill, or driving an automobile at an unlawful rate of speed": 30 C. J., page 87, sec. 269.

There is no evidence in this case which either directly or by inference points to the offense of *in*voluntary manslaughter. The mere fact that the defendant "got the revolver from the safe with the intention of scaring" the deceased, would not be "an unlawful act" whose "incident" was the killing of the deceased, and thus support a finding of guilty of *in*voluntary manslaughter. If a man has reasonable grounds for believing that he is in danger of death or grievous bodily harm from the acts of another, he does not do an unlawful act when he "gets a revolver," and this is especially true when he is in his home or place of business or elsewhere where he has an undoubted right to be.

The only verdict in this case which would have been consistent with any reasonable view or interpretation of the evidence, no matter whose testimony is credited, was guilty of murder in the first degree or guilty of murder in the second degree or guilty of voluntary manslaughter, or an acquittal. When a new trial is had on this murder indictment the defendant cannot, of course, be tried for murder in the first degree. The verdict of the jury in the trial now being reviewed was equivalent to defendant's acquittal of that crime. See *Com. v.*

*Deitrick,* 221 Pa. 7, 70 A. 275. The second assignment of error is overruled.

The judgment is reversed and a venire facias de novo is awarded.