Commonwealth *v.* Heckathorn, Appellant.

Argued May 23, 1967. Before BELL, C. J., MUS-
MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Rocco L. Puntureri,* with him *M. L. McBride, Jr.,* for appellant.

*Joseph J. Nelson,* Assistant District Attorney, with him *Edward M. Bell,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, April 24, 1968:

On October 6, 1965, the body of Clair Heckathorn, a farmer and resident of Mercer County, was found shot to death in his home. Shortly thereafter, the defendant, aged 16 years, was arrested and committed to Mercer County jail. He submitted to questioning by the arresting officers for several two-hour periods, both on October 6th and 7th. On October 7, defendant was taken to his father's home and, with his father's permission, a search was conducted which uncovered a revolver later found to bear evidence of defendant's fingerprints.

On the morning of October 8, James Heckathorn, the brother of the defendant, "voluntarily" appeared at the Mercer County station house, and in the presence of police gave a statement confessing complicity of both himself and his brother in the homicide. Later that

morning, defendant was brought to the station house and his brother's statement was read to him. He admitted that his brother's statement was true, and then gave a statement in which he admitted that he shot the deceased while he and his brother were robbing him. Up to the time of this confession, no charges had been filed against defendant, although the arresting officers had been previously advised to do so by Judge RODGERS.

Thereafter, a bill of indictment which included the counts of murder, voluntary manslaughter and involuntary manslaughter was found against defendant. Defendant was tried and found guilty of murder in the first degree and sentenced to life imprisonment. He has appealed from the judgment of sentence.

## I.

### Charge of Court on Voluntary Manslaughter

Appellant contends that the trial Court committed error by failing to charge the jury on the law of voluntary and involuntary manslaughter. Defendant particularly objects to this portion of the charge: ". . . At the present time, the only duty before the jury is to determine whether the defendant is not guilty or guilty of murder in the second degree, or guilty of murder in the first degree. That is all that you are required to do at this time."

For over one hundred years it has been the well-settled rule in this Commonwealth that the jury has the right and power to decide the guilt or innocence of an accused and what crime or crimes, if any, he has been guilty of. *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A. 2d 369; *Commonwealth v. Steele,* 362 Pa. 427, 66 A. 2d 825; *Commonwealth v. Schmidt,* 423 Pa. 432, 224 A. 2d 625; *Commonwealth v. Meas,* 415 Pa.

41, 202 A. 2d 74; *Rhodes v. Commonwealth*, 48 Pa. 396; *Lane v. Commonwealth*, 59 Pa. 371; see also, Act of June 24, 1939, P. L. 872, 18 P.S. §4701. Relying thereon, defendant-appellant contends that the Court committed fatal and reversible error by its charge because it thereby took from the jury its power to find defendant guilty of only voluntary manslaughter.

Notwithstanding the aforesaid power of a jury to find a defendant charged with murder guilty of voluntary manslaughter only, the law is likewise well settled that *a defendant is entitled to a charge on the law of manslaughter only* when there is some evidence to support such a verdict. *Commonwealth v. Pavillard*, 421 Pa. 571, 220 A. 2d 807; *Commonwealth v. LaRue*, 381 Pa. 113, 112 A. 2d 362; *Commonwealth v. Flax*, 331 Pa. 145, 200 Atl. 632; *Commonwealth v. Yeager*, 329 Pa. 81, 196 Atl. 827; *Commonwealth v. Carroll*, 326 Pa. 135, 191 Atl. 610; *Commonwealth v. Miller*, 313 Pa. 567, 569, 170 Atl. 128; *Commonwealth v. Crossmire*, 156 Pa. 304, 27 Atl. 40; *Commonwealth v. Buccieri*, 153 Pa. 535, 26 Atl. 228.

Thus, the important question for us in this appeal is whether there was any evidence which was sufficient to reduce this killing to voluntary manslaughter. In this appeal, defendant contends that he was innocent of any crime, and that at the most the killing amounted to voluntary manslaughter. These contentions, and particularly the latter one, are based upon the theory or contention that defendant spent the night in the home of his uncle and that his uncle was killed the following day as the result of an altercation during which defendant's gun went off. We note, incidentally, that defendant did not testify that his gun went off accidentally or unintentionally, or exactly how it went off. This contention was not presented in the lower Court. The only evidence cited to support it in this

appeal is the testimony of a witness for the Commonwealth that there was an indentation in the bed in the room of defendant's uncle roughly conforming to the shape of a body, which defendant's counsel now contends was the body shape of defendant. Defendant's confession, which he now seeks to repudiate because allegedly made under duress, was to the effect that he entered his uncle's house with the intention of stealing checks, and that in the process of obtaining them he had a short struggle with his uncle. He now seeks to combine the statement in his repudiated confession of his alleged struggle with his uncle with the aforesaid testimony about the *impression* of a body on the bed; obviously, there is no connection between these two bits of evidence. Furthermore, this evidence is clearly and without the slightest doubt insufficient to prove a crime of provocation or passion—namely, voluntary manslaughter.

In *Commonwealth v. Pavillard,* 421 Pa., supra, this Court said (pages 575-576) : "Defendant's second allegation of an error in the Court's charge raises a serious problem. The problem, concisely stated, is whether the trial Court, in a murder case, must charge on the issue of voluntary manslaughter where no proof of a killing under the influence of legal passion or provocation exists.

"In Commonwealth v. Nelson, 396 Pa. 359, 364, 152 A. 2d 913, the Court, citing many authorities, thus defined voluntary manslaughter (page 364) : 'In Commonwealth v. Donough, 377 Pa., supra, the Court quoting from Commonwealth v. Palermo, 368 Pa. 28, 81 A. 2d 540, said (page 52) : " ' "Voluntary manslaughter is a homicide intentionally committed under the influence of passion." Commonwealth v. Colandro, 231 Pa. 343, 350, 80 A. 571 (1911) ; Commonwealth v. Cargill, 357 Pa. 510, 513, 55 A. 2d 373 (1947) . . .' "

" ' "In Commonwealth v. Colandro, 231 Pa. 343, 80 A. 571, the Court said (page 350) : . . .' "The term 'passion' as here used includes both anger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected:" 21 Am. & Eng. Ency. of Law (2d ed.) 173. "Passion, as used in a charge defining manslaughter . . . means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection"; 6 Words & Phrases, p. 5227.' " '

"In the instant case there was absolutely *no evidence of legal passion or provocation** such as to reduce the crime from murder to voluntary manslaughter. *That being so, this Court has consistently and wisely held that the trial Judge is not required to charge the jury on the issue of voluntary manslaughter.* Commonwealth v. LaRue, 381 Pa. 113, 112 A. 2d 362; Commonwealth v. Yeager, 329 Pa. 81, 196 Atl. 827; Commonwealth v. Miller, 313 Pa. 567, 569, 170 Atl. 128. *A charge on a point or issue which is unsupported by any evidence is likely to confuse the jury and obstruct Justice.*

"In Commonwealth v. LaRue, 381 Pa., supra, in a case very similar to the one at bar, the Court said (pages 121-122) : 'Failure of the trial Judge to submit to the jury voluntary manslaughter as a possible verdict was not error. Where there is some evidence which would reduce the crime to voluntary manslaughter, defendant is entitled to have the jury instructed upon the subject: Commonwealth v. Flax, 331 Pa. 145, 200 A. 632. But where there is no evidence of manslaughter, it is proper for the court to refuse to submit to the jury the issue of manslaughter. In Commonwealth v. Yeager, 329 Pa. 81, 85, 196 A. 827, Jus-

---

* Italics throughout, ours.

tice (later Chief Justice) MAXEY said: "It is well set-
tled that on a trial for murder where there is no evi-
dence which in the remotest degree points to the of-
fense of manslaughter, the court commits no error in
instructing the jury that a verdict of guilty of man-
slaughter would not be warranted. See Com. v. Car-
roll, 326 Pa. 135, 191 A. 610; Com. v. Crossmire, 156
Pa. 304, 27 A. 40, and Com. v. Buccieri, 153 Pa. 535,
26 A. 228." ' "

## II.

### Constitutional Right to Counsel

Appellant next contends that the statement or con-
fession of his brother, which he admitted was true and
correct, was obtained in violation of his Constitutional
right to counsel, and consequently was inadmissible.
*Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772,
upon which defendant relies, aptly states the recent
tests which are applicable. In *Johnson v. New Jersey,*
the Court, speaking through Chief Justice WARREN, re-
iterated the prior law that "coerced confessions are,
of course, inadmissible regardless of their alleged truth
or falsity. See Rogers v. Richmond, 365 U.S. 534
(1961)"; and, more importantly, said (page 721) : "We
hold that Escobedo affects only those cases in which
the trial began after June 22, 1964, the date of that
decision. We hold further that Miranda* applies only

---

* In *Miranda v. Arizona,* 384 U.S., supra, the Court pertinently
said (page 479) : ". . . the following measures are required. He
must be warned prior to any questioning that he has the right
to remain silent, that anything he says can be used against him
in a court of law, that he has the right to the presence of an at-
torney, and that if he cannot afford an attorney one will be ap-
pointed for him prior to any questioning if he so desires. Oppor-
tunity to exercise these rights must be afforded to him through-
out the interrogation. After such warnings have been given, and

542

to cases in which the trial began after the date of our decision [on June 13, 1966]."

In this trial, which commenced on *March 28,* 1966, defendant-appellant is entitled (1) to the *Escobedo* warnings but (2) not to the *Miranda* warnings, which laid down additional warnings or guidelines (see *Johnson v. New Jersey,* 384 U.S., supra, page 734). In *Johnson v. New Jersey,* the Court said (pages 733-734): "Apart from its broad implications, the precise holding of Escobedo was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial, '[where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent . . . .' 378 U.S., at 490-491."

In *Commonwealth v. Schmidt,* 423 Pa. 432, 224 A. 2d 625, the Court said (pages 440, 441) : ". . . In other words, under Escobedo [*v. Illinois,* 378 U.S. 478], supra, an individual is not unconstitutionally deprived of the assistance of counsel during police questioning, unless he requested such assistance *and was not effectively warned of his right to remain silent* [footnote omitted]. . . . In the present case, it was established by credible and competent evidence, which the lower court accepted as true, that Schmidt never requested

---

such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." Accord: *Commonwealth v. Senk,* 423 Pa. 129, 223 A. 2d 97.

the assistance of counsel during the period of police questioning. His testimony to the contrary was rejected below as unworthy of belief. . . . Under the circumstances, the absence of counsel during the questioning did not per se render evidence of the incriminating statements constitutionally inadmissible."

In this case, it is clear that appellant never requested counsel either before or after he had become the "focus" of the investigation.

### III.

#### Hearsay Testimony

Appellant next objects to the admission of hearsay testimony. It will suffice to say that the challenged testimony was not prejudicial to appellant and, more important, it was not objected to, and hence was waived. *Commonwealth v. Dessus,* 423 Pa. 177, 186-187, 224 A. 2d 188; cf. also, *Lewis v. Pittsburgh Railways Co.,* 386 Pa. 490, 126 A. 2d 454; *Enfield v. Stout,* 400 Pa. 6, 161 A. 2d 22.

### IV.

#### Voir Dire

Appellant contends that the comments of the trial Judge during voir dire constituted reversible error. Upon examination of the second prospective juror, who stated that he would be more lenient in his judgment of a minor even to the extent of requiring "more evidence" to convict, the Court emphatically condemned such views while referring to the growing wave of juvenile crime in Mercer County. While this comment and condemnation were improper (*Gallegos v. Colorado,* 370 U.S. 49), they were adequately cured by the subsequent and thrice repeated corrective statements made by the trial Judge.

## V.

### Voluntariness of Confession and Due Process

Appellant contends that his statement or confession was procured from him involuntarily. According to the testimony of the police, defendant was questioned twice by two policemen for a period of approximately two hours each time, and after police officers had told him that anything he said could be used against him in Court and that he was entitled under the law to be represented by an attorney.* Such police interrogations did not make appellant's confession coerced or involuntary.

However, appellant further contends that he was denied due process because of the refusal of the trial Court to submit to the jury the question of the voluntariness of his confession. We must sustain this contention. Prior to *Escobedo v. Illinois,* 378 U.S., supra, the law in Pennsylvania with respect to the voluntariness of a statement or confession did not require any warning (a) that the defendant or accused had a right to remain silent or (b) that what he said might be used against him at the trial. *Commonwealth v. Bryant,* 367 Pa. 135, 147, 79 A. 2d 193. However, this was changed by the Supreme Court of the United States in *Escobedo v. Illinois,* 378 U.S., supra; *Jackson v. Denno,* 378 U.S. 368; and later in *Miranda v. Arizona,* 384 U.S., supra. See also, *Commonwealth v. Schmidt,* 423 Pa., supra; Pa. Rules of Criminal Procedure No. 323. In *Jackson v. Denno,* the Court held (1) that there must be an independent pretrial or evidentiary hearing on the *voluntariness* of an alleged confession, and (2) that if such an evidentiary hearing is held and it

---

* The testimony is ambiguous as to whether he was advised of his right to remain silent, and is not as clear and as positive as it will have to be on a retrial.

is determined by the Court that the alleged confession was voluntary, the *voluntariness* of the confession must subsequently be considered and determined by the jury (or by a Judge if there be a plea of guilty) at the actual trial. Pa. R. Crim P. 323(e), following *Jackson v. Denno*, 378 U.S., supra, provides: "If the court finds the confession to be admissible, the defendant may not again raise the issue of admissibility at trial except upon a showing of evidence which was not available at the hearing, but he may offer evidence at trial on the issue of whether the confession was made voluntarily." For this reason,

Judgment reversed, and new trial ordered.

Mr. Justice COHEN took no part in the consideration or decision of this case.

CONCURRING OPINION BY MR. JUSTICE EAGEN:

In my view the confession of Heckathorn was secured by the police under circumstances violative of *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758 (1964), and therefore its use as trial evidence denied the defendant due process of law.

Hence, I concur in the order granting a new trial.

CONCURRING OPINION BY MR. JUSTICE O'BRIEN:

I concur in the result reached by the majority. Pa. R. Crim. P. 323(e) does indeed require that, after a determination in an evidentiary hearing that a confession is voluntary, the *voluntariness* of the confession be submitted to the jury. This procedure was not followed in the instant case.

However, this procedure is not mandated by *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964). Although *Jackson* required an independent pretrial evidentiary hearing, it left a choice as to the procedure to be followed thereafter. Either the orthodox (Wig-

more) rule or the humane (Massachusetts) rule is permissible. Under the orthodox rule, the judge himself solely and finally determines the voluntariness of the confession, *Jackson,* supra, at page 378, and the jury considers voluntariness only as it affects the weight or credibility of the confession. Under the humane rule, if the judge finds the confession voluntary, the jury is then instructed that it must also find that the confession was voluntary before it may consider it. *Jackson,* supra, at page 417. Pennsylvania now follows the humane rule, as the Comment to Rule 323 makes clear: "While the Rule requires an advance determination by the court of the admissibility of a confession as an item of evidence at trial, if the court decides that the confession is admissible, the Rule does not change the present Pennsylvania law under which *the issues of both voluntariness and credibility of a confession are submitted to the jury* under appropriate instructions for determination of guilt." (Emphasis added)

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

As to the issues involving appellant's confession, I agree with the majority that *Jackson v. Denno* requires a new trial but that is the only thing I agree with. At least in my opinion, an examination of the events culminating in Herbert Heckathorn's confession reveals that this confession was involuntary and, if not involuntary, procured under circumstances violative of *Escobedo.*

Assuming for the moment that Herbert was given the required *Escobedo* warnings, a chronology is necessary.[1] Clair Heckathorn was shot and killed some

---

[1] Given the fact that the court below found this confession to be voluntary, I have considered only "the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains un-

time during the day of October 5, 1965. The Pennsylvania State Police were initially informed of the shooting in the early morning hours of the 6th and the first officer arrived at the scene at approximately 9:00 a.m. Appellant's original contact with the police was that evening when he was taken into custody by two state troopers at 9:30 p.m. He was, at the time of arrest, 16 years old, a poor student, and a freshman in high school having repeated two grades. Herbert was told by the police that his uncle was dead but not that he was in any way suspected.

Taken immediately to a state police substation, he was searched and questioned. Appellant was seated in a swivel chair, which he had to move to face various officers when questioned. After this period of questioning, Herbert was driven to the Mercer County jail and placed in the custody of the prison authorities at 11:00 p.m. The two arresting officers then proceeded to the home of Herbert's parents (also his residence) to search for the murder weapon. Unsuccessful, they returned to the county jail. A second period of questioning began at 1:00 on the morning of the 7th. The record contains no indication of the length of either of these two periods of questioning.

At 8:45 on the morning of the 7th Herbert was removed from jail and taken to the chambers of Judge RODGERS. The judge was informed that appellant was a truant from school but not that he was a murder suspect. He was returned to jail and then, at 11:15 a.m., was again removed, taken to his parents' home for a second weapon's search at which time a gun (not the murder weapon) was found. Herbert was then transported to decedent's house and finally back to jail.

contradicted." *Culombe v. Connecticut*, 367 U.S. 568, 604, 81 S. Ct. 1860, 1880 (1961). See generally *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968).

According to the record, appellant's next police contact was 7:25 a.m. on the 8th when he was taken to a state police substation to be fingerprinted (the fingerprints were obtained for comparison with another weapon which had been found by the police); he was then returned to jail. Appellant's brother, James, arrived at the substation approximately 8:45 a.m., apparently after Herbert had left. James confessed that he was a lookout and that his brother was the killer. After this statement was completed, two state policemen proceeded to the Mercer County District Attorney's office and informed an assistant district attorney that James had given a statement implicating Herbert. Judge RODGERS was informed of this development and advised the police to file charges against Herbert. Charges were not filed; the state police instead, in an admitted attempt to obtain evidence against appellant, at 11:25 a.m. again removed him from jail and transported him to the substation.

Herbert was confronted with his brother in the presence of five state policemen and the county coroner. James related his version of the events surrounding the murder. Asked if this version was true, appellant answered yes. He was then further questioned and an oral statement obtained (no written statement was taken) adding details not covered in James' statement. Two officers then took Herbert for another automobile ride since appellant had promised during this interrogation period to show the officers where decedent's wallet had been disposed of. The wallet was located and Herbert returned to the substation at 1:40 p.m. The first formal charge was filed at some time prior to 2:20 p.m., although Judge RODGERS began his attempts to obtain counsel for appellant at about 12:45 p.m.

Mrs. Heckathorn testified that the state police had visited her home over three times but not once prior

to the filing of charges were the parents informed of their son's predicament. She stated that she first learned of these charges from her mother at 5:30 p.m. on the 8th and that this information was confirmed by a telephone call from the police later that evening. She emphatically testified that, had she known of the extent of her son's involvement, she would have obtained an attorney; no action was taken because she believed that Herbert was being held as a truant from school.

In sum, appellant was in police custody for over 40 hours before any formal action was taken. His parents were not informed, he was questioned at least three times, searched and fingerprinted. He was removed from jail at the will of the police and, despite judicial admonition to file charges, was not charged until after the crucial confession was obtained. These facts must be placed against the cases establishing standards to be applied in determining the voluntariness of a confession procured from an accused of sixteen.

## I.

The Supreme Court of the United States has explicitly stated that a defendant in his early teens is not to be judged by adult standards. *Gallegos v. Colorado,* 370 U.S. 49, 53-54, 82 S. Ct. 1209, 1212 (1962); *Haley v. Ohio,* 332 U.S. 596, 599-600, 68 S. Ct. 302, 304 (1948). Speaking of Robert Gallegos, a 14 year old suspect, that Court stated (370 U.S. at 54-55, 82 S. Ct. at 1212-13) : "He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps

he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights."

Fourteen years earlier, the Supreme Court had this to say about an accused of fifteen (332 U.S. at 599, 68 S. Ct. at 303-04) : "What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces." In *Haley,* the accused was questioned for five hours. After having been shown the confessions of his alleged coconspirators, he confessed. This five hour period alone was sufficient for the Supreme Court to declare the confession unconstitutionally obtained.

Although the record does not indicate that Herbert was at any one point questioned continuously for five hours, I am convinced that this alone is not probative. For the Supreme Court in *Haley,* supra at 600-01, 68 S. Ct. at 304, tells us that the following factors are significant: "The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous

attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction." The police attitude in this litigation was callous. Not only did they misinform Herbert's parents and Judge Rodgers as to the true reason for appellant's detention but they also, in furtherance of their efforts to procure additional evidence, disregarded judicial advice to file charges. A youth of 16 of limited intelligence, held incommunicado by the police for 40 hours, searched, questioned at least three times, fingerprinted, and then confronted with five policemen and his brother's accusations cannot be presumed to have made a voluntary statement.

Nor does the fact that Herbert was warned of his constitutional rights change this picture. Haley was given similar warnings, yet the Supreme Court gave short shrift to any argument based upon the presence of warnings (332 U.S. at 601, 68 S. Ct. at 304) : "But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements." With the burden upon the Commonwealth to convince this Court that Herbert's confession was voluntary, see *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968), I am totally unconvinced. On this basis alone I would exclude the confession at appellant's retrial.

## II.

In an attempt to demonstrate that the warnings here given meet *Escobedo* standards, the majority has turned that decision upon its head. Its opinion states that the accused never requested counsel and that therefore *Escobedo* was not violated. However, our cases make clear beyond doubt that the initial inquiry is whether the accused was warned of his right to remain silent. If he was not, the lack of request for counsel is completely irrelevant and *Escobedo* has been violated.[2] We thus said in *Commonwealth v. Jefferson*, 423 Pa. 541, 544, 226 A. 2d 765, 767 (1967) : "It is now settled that under Escobedo, an individual subject to police questioning is not deprived of his constitutional right to counsel unless such assistance is requested and denied. See, Commonwealth v. Schmidt, supra. Hence, since Jefferson made no request for counsel, the absence thereof, or an effective waiver of the right thereto, did not ipso facto render testimony of the statements constitutionally inadmissible. *But, Jefferson was also not advised of her right to remain silent and this, in our opinion, under the teaching of Escobedo precluded evidentiary use of the statements made to Officer Zevtchin.*" (Emphasis supplied.) This concept, reiterated in *Commonwealth v. Vivian*, 426 Pa. 192, 231 A. 2d 301 (1967) and *Commonwealth v. Medina*, 424 Pa. 632, 227 A. 2d 842 (1967), is a simple one—the constitution demands that in any post-*Escobedo* case the accused at least have been warned of his

---

[2] The majority's position ignores the very basic fact that the right to counsel is merely a derivative of the right to remain silent. See *Miranda v. Arizona*, 384 U.S. 436, 468-69, 86 S. Ct. 1602, 1624-25 (1966). If an accused is not told of the basic right, it is folly to assume that he has knowledge of the derivative right sufficient to request the exercise of that derivative right.

right to remain silent; and if not so warned, his confession is constitutionally tainted.

With this in mind, I now turn to an examination of exactly what the police told Herbert at the time he was confronted with James' statements.[3] Of the five officers present, only two testified. Trooper Lamberton stated on direct examination that he advised appellant "that anything he said could be used against him in court [and] that he could remain silent . . . ." (Record at 631.) On cross-examination, however, Trooper Lamberton insisted that "I told him that anything he said could be used against him *or for him* in court *if this came to trial* . . ." and added that he did *not* warn appellant of his right to remain silent. (Record at 638. Emphasis supplied.) Thus, this witness' testimony is completely contradictory as to whether the crucial warning was in fact given.

The other officer, Trooper Balchunas, was positive that he told appellant "that he could remain silent. . . ." (Record at 665.) Putting aside the age of the accused,[4] I believe that *Commonwealth v. Medina,* supra, demonstrates that even for an adult the warnings given were not sufficient. Trooper Lamberton's testimony is, as noted above, of little value; the best Trooper Balchunas could offer was that Herbert was told that "he could remain silent." We stressed in *Medina* (424 Pa. at 633, 227 A. 2d at 843): "While the record in the instant case discloses uncontradicted testimony that

---

[3] In a footnote, the majority cryptically notes: "The testimony is ambiguous as to whether he was advised of his right to remain silent, and it is not as clear and as positive as it will have to be on a retrial." The import of this observation is nowhere explained.

[4] The rationale of both *Gallegos* and *Haley* dictates that stricter standards of clarity are required when examining the warnings given to an accused youth. Yet I am convinced that stricter standards need not be applied here for even if Herbert was an adult this confession is invalid under *Escobedo.* See text, infra.

on two occasions during the police questioning in which the statements were obtained, Medina was warned that he did not have to say anything unless he wanted to, this, in itself, was *insufficient* to constitute an effective warning of his right not to convict himself. It was also mandatory that he be advised that *anything he said could and would be used against him in court,* and admittedly no such explanation was given." (Emphasis supplied.) Trooper Balchunas' testimony contains no indication that Herbert was told that anything he said could be used against him. Nor can I accept as a sufficient warning Trooper Lamberton's testimony that anything said would be used "for and against" appellant. This statement contains the clear implication that the police were attempting to aid Herbert, one which the record demonstrates is not warranted. It thus lacks the clarity and precision required in a situation of this type. See *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S. Ct. 1602, 1625 (1966): "The warning of the right to remain silent must be accompanied by the explanation that anything said can *and will* be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—*that he is not in the presence of persons acting solely in his interest."* (Emphasis supplied.) Not only does Trooper Lamberton's testimony indicate that Herbert was not warned that his inquisitors were not acting solely in his interest but it further lacks the warning that the confession *will* (according to this witness, Herbert was told that it "could be used for him") be used against appellant.

Whether viewed as a voluntariness problem or an *Escobedo* problem, appellant's confession is constitutionally tainted. I therefore believe that it must be excluded at his retrial, and thus concur only in the award of a new trial.