J-S11011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                    :           PENNSYLVANIA
                                    :
             v.                          :
                                    :
                                    :
JESSICA LEE CALLAHAN         :
                                    :
          Appellant          :    No. 1129 WDA 2024

Appeal from the Judgment of Sentence Entered August 16, 2024
In the Court of Common Pleas of Butler County Criminal Division at
No(s): CP-10-CR-0000538-2023

BEFORE: MURRAY, J., KING, J., and LANE, J.

MEMORANDUM BY MURRAY, J.:         **FILED: April 22, 2025**

Jessica Lee Callahan (Appellant) appeals from the judgment of sentence entered following her conviction of third-degree murder, 18 Pa.C.S.A. § 2502(c). After careful review, we affirm Appellant's judgment of sentence.

On March 20, 2023, Appellant and her paramour, Tyler Whitlach (Tyler or the victim), argued, after which Appellant shot Tyler in the back with a shotgun. This took place at 462 Kohlmeyer Road, in Butler County, Pennsylvania, where Appellant lived with her father. After the shooting, Appellant attempted to drive Tyler, who was seriously injured, to Butler Memorial Hospital. However, as Tyler's condition worsened, Appellant stopped her vehicle near the North Washington Rodeo Grounds (rodeo grounds) and telephoned 911. Tyler subsequently died at the rodeo grounds. An autopsy later revealed that Tyler died as a result of a shotgun pellet piercing his lung

and aorta. This pellet, as well as two other pellets, were determined to have entered Tyler's back and the path of the projectile traveled from back to front.

Pennsylvania State Police (PSP) Corporal Jordan Eckman (Corporal Eckman) interviewed Appellant shortly after the shooting. During this interview, Appellant offered differing, exculpatory versions of the events. Appellant was arrested and charged with the shooting death of Tyler.

A jury subsequently convicted Appellant of third-degree murder. Thereafter, on August 16, 2024, the trial court sentenced Appellant to 10 to 20 years in prison. Appellant filed an untimely post-sentence motion, which the trial court denied. Appellant filed a timely notice of appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. [Whether] the evidence was uncontroverted (as shown by the Commonwealth's own evidence) that the fatal shot that was fired was a ricochet of a warning shot, which clearly indicat[ed] that this was not an intentional murder, and consequently does not satisfy the facts necessary for a conviction of third-degree murder[?]

2. Did the [trial court] err when it did not allow [Appellant's proposed] point for charge[?]

Appellant's Brief at 6.

Appellant first challenges the sufficiency of the evidence underlying her conviction of third-degree murder. *Id.* at 9. Appellant argues that

> the fatal shot that was fired was a ricochet of a warning shot, which clearly indicat[ed] that this was not an intentional murder, and consequentially does not satisfy the facts necessary for a conviction of third-degree murder.

- 2 -

*Id.* Appellant asserts,

> [r]eferring to the entirety of the evidence adduced at trial, including the exhibits introduced, the evidence clearly shows that there was only one shot fired, that [the] shot clearly hit a tree, and that the distance from where the shot hit the tree was at least the (10) [*sic*] from the position of the deceased body (as indicated by [Tyler's] dropped cell phone)[.]

*Id.* at 12-13. Appellant, who testified at trial, relies on her "uncontroverted testimony" describing the shot as a "warning shot." *Id.* Without any citations to the record, Appellant argues that the evidence

> clearly indicated that the pellets hit [Tyler] from the front and the side of his back, all from different angles. This physical evidence clearly shows that the one shot fired was a ricochet and not a "shot in the back."

*Id.* at 13.

Appellant also argues the evidence failed to establish the malice necessary for a conviction of third-degree murder. *Id.* at 13-14. In support, Appellant relies on the fact that Tyler was still alive after being shot, and refers to evidence of Appellant's efforts to keep Tyler alive following the shooting. *Id.* at 14. Again, without any citations to the evidence of record, Appellant argues that the evidence "was overwhelming" that Tyler physically beat and abused her, including on the day of the shooting. *Id.* at 16. Appellant also claims the evidence is "ineluctable" that she exited her home because of her fear of Tyler, and that she possessed the shotgun to protect herself. *Id.*

We review a challenge to the sufficiency of the evidence under the following standard:

- 3 -

Our standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to enable the fact[-]finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt.

*Commonwealth v. Cruz*, 71 A.3d 998, 1006 (Pa. Super. 2013) (citation and brackets omitted).

[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.... Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Crosley*, 180 A.3d 761, 767 (Pa. Super. 2018) (citation omitted).

Importantly, "[**t**]**o preserve a sufficiency claim, the** [**Pa.R.A.P.**] **1925(b) statement must specify the element or elements upon which the evidence was insufficient.**" *Commonwealth v. Widger*, 237 A.3d 1151, 1156 (Pa. Super. 2020) (emphasis added).

In her court-ordered concise statement, Appellant identified the following issue: "The verdict [*sic*] was insufficient to sustain a verdict for third-degree murder." Concise Statement, 10/16/24, ¶ 2. Appellant's concise statement failed to identify the element(s) of third-degree murder purportedly not supported by the evidence. In its appellate brief, the Commonwealth

objects to this defect. Commonwealth's Brief at 15-16. Similarly, the trial court deemed Appellant's sufficiency challenge waived, but generally concluded that the evidence is sufficient to sustain the verdict of third-degree murder. Trial Court Opinion, 11/18/24, at 2. The trial court's opinion does not address any particular element of third-degree murder, or the evidence supporting each element. *See id.* Under these circumstances, we conclude that Appellant waived her sufficiency challenge. ***Widger***, 237 A.3d at 1156.

We further observe that Appellant has not supported her argument with *any* citations to the record. "[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. ... The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities." ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007) (citations omitted); ***see also*** Pa.R.A.P. 2119 (c) ("If reference is made to … any other matter appearing in the record, the argument must set forth … a reference to the place in the record where the matter referred to appears …."). Because Appellant failed to support her argument with citations to the record, we conclude this claim is waived. ***See Hardy***, 918 A.2d at 771.

Even if Appellant had preserved her sufficiency challenge, we would conclude it lacks merit. As our Supreme Court has explained,

> to convict a defendant of the offense of third[-]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but

- 5 -

[also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

***Commonwealth v. Fisher***, 80 A.3d 1186, 1191 (Pa. 2013) (citations omitted). "Specific intent and malice may be inferred through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." ***Commonwealth v. Hicks***, 156 A.3d 1114, 1124 (Pa. 2017).

Instantly, at trial, Mark Rumbaugh (Mr. Rumbaugh) testified that on March 20, 2023, while driving south on Pennsylvania Route 38, he observed a vehicle pulled over at the rodeo grounds. N.T. (Morning Session), 7/15/24, at 42. As Mr. Rumbaugh explained,

[w]hen I first went by there, I noticed a car sitting on the right-hand side of the road …. I noticed there was a female giving CPR to someone laying on the ground outside the car. I went past them … I turned around and went back.

I noticed when I got out of the truck [Appellant] was not giving [Tyler] CPR anymore, so I offered to continue. She said, "No, he is gone." So I asked a second time, "Do you want me to make an attempt to continue CPR until the ambulance gets here?" And she said, "No, he's definitely gone." So at that point, I just stepped back, and she was on the phone with 911, and I realized that she said she shot [Tyler].

***Id.*** Mr. Rumbaugh described listening to Appellant explain the situation to the 911 operator:

[Appellant] said there was an altercation, and she ended up shooting [Tyler] because he would not stop. I don't know if he was abusing her or hitting her, I don't know.

- 6 -

*Id.* at 43. Mr. Rumbaugh described Appellant as "[v]ery upset and crying." *Id.* at 44. Mr. Rumbaugh stayed at the scene for approximately 10 minutes, until police arrived. *Id.* at 43, 45.

A recording of Appellant's 911 call was played for the jury. In that call, Appellant told the dispatcher that Tyler "came at me." Commonwealth Exhibit 1 (0:34). Appellant explained that "I let off a warning shot and he came at me." *Id.* (10:00). During the 911 call, a PSP trooper also spoke with Appellant. *Id.* (17:10). When asked what had precipitated the confrontation, Appellant indicated that Tyler saw something on her cell phone and threatened to "beat the fuck out of her." *Id.* (17:45). According to Appellant, they went outside, and when Tyler threatened her, she returned to the house to get her gun. *Id.* Appellant claimed she fired a warning shot, but Appellant "came at me." *Id.* (18:00).

The same day of the shooting, PSP Corporal Max DeLuca (Corporal DeLuca) and PSP Trooper Jennifer Cantella interviewed Appellant at the PSP barracks in Butler. N.T. (Afternoon Session), 7/15/23, at 4-5, 8. A video recording of this interview was played for the jury. *Id.* at 9. However, because of file corruption, a portion of the interview's transcript was read to the jury. *Id.* at 10. No objection was lodged by defense counsel. *Id.* at 11.

In the portion read aloud to the jury, Appellant stated that shortly prior to the shooting, Tyler threatened her with a cinder block. *Id.* at 12. Appellant stated Tyler "grabbed the cinder block and once he goes to turn around, I

shoot." *Id.* at 12. According to Appellant, Tyler was in the driveway at the time she fired her "warning shot." *Id.* Appellant then explained, "I was on the stairs and [Tyler] was coming out of the house." *Id.* The following portion of the interview was read to the jury:

[Appellant: Tyler] was looking at me.

Corporal DeLuca: Okay.

[Appellant]: And I shot in the air.

Corporal DeLuca: Like straight up … ?

[Appellant]: Not like straight-straight. Like, I know to shoot kind of diagonal so it doesn't come down.

Corporal DeLuca: Come back down and hit you?

[Appellant]: Yeah.

….

Corporal DeLuca: … So you do this warning shot, other than this warning shot –

(Whereupon the video resumes playing.)

N.T., 7/15/24, at 13.

During her interview with Corporal DeLuca, Appellant drew a diagram of the scene at the time of the shooting. However, Appellant's initial diagram did not match photographs taken at the scene. *Id.* at 16, 28-29. Appellant originally stated Tyler was on the stairs at the time of the shooting. *Id.* at 31. According to Corporal DeLuca, Appellant stated she fired two shots, with

- 8 -

one shot being a warning shot.[1]  *Id.* at 40, 42.  However, Corporal DeLuca testified that he

> reviewed photographs.  There was nothing in the photographs, that I observed, that led me to believe there were two shots, because of the lack of two shell casings spent at the scene….

*Id.* at 41.

In her first diagram, Appellant depicted the location of Tyler and cinder blocks at the property.  *Id.* at 15.  However, as the interview was taking place, Trooper DeLuca received by text message photographs from PSP troopers at the crime scene.  *Id.*  The photographs depicted cinder blocks, but they were buried in the ground in a different location than that depicted in Appellant's diagram.  *Id.* at 29.  Appellant drew two other diagrams, each changing to address discrepancies between Appellant's diagrams and the crime scene photographs received by Corporal DeLuca.  *See id.* at 32-34.

Corporal Eckman also testified.  N.T., 7/15/24, at 21.  Corporal Eckman explained that he was assigned to the Butler PSP barracks on March 20, 2023.  On that day, he responded to a report of a gunshot victim at 462 Kohlmeyer Road in Hilliards, Pennsylvania.  *Id.* at 21-22.  According to Corporal Eckman, while at the scene, the troopers received a telephone call from Corporal DeLuca.  *Id.* at 22.  Corporal Eckman confirmed that photographs presented

---

[1] Officers found evidence of only one gunshot being fired.

at trial accurately represented the scene at 462 Kohlmeyer Road on March 20, 2023. *Id.* at 23.

The Commonwealth presented the testimony of expert forensic pathologist Todd Luckasevic, D.O. (Dr. Luckasevic). N.T., 7/16/23, at 8. Dr. Luckasevic testified that he performed an autopsy on Tyler on March 20, 2023. *Id.* at 10, 18. Dr. Luckasevic stated that Tyler

> had four pellet wounds on his body. … I don't know what [wound] came first or what came second. They should all hit him, more or less, simultaneously, so pellet A enters the right lateral back ….
>
> This pellet causes a hemorrhagic and destructive path through the skin, subcutaneous tissues, and muscles of the back. The pellet then enters the back of the chest cavity by coursing through the intercostal space between ribs nine and ten ….
>
> From there, it lacerates the right lower lobe of the lung, the aorta at the level of T10; that's a thoracic vertebrae level, so the aorta, which is the largest artery in the body, and then it crosses a midline, and it injures the lower lobe of the left lung. So this pellet hits both of the lungs and the largest artery of the body. This is a lethal shot.
>
> … [T]his pellet goes from back to front, right to left, and downward.
>
> ….
>
> … Pellet B enters the right midback, so this one is more medial towards the center of the back and a little bit up higher. This one injures the skin, subcutaneous tissues, and muscles of the right midback, and then I recover the pellet from the muscles of the left midback. This pellet travels from back to front, right to left, and downwards; same as the previous pellet. This is a non-lethal injury ….
>
> ….

Pellet C enters the right posterior lateral upper chest axilla, so the armpit; towards the back of the armpit. This pellet injures the … subcutaneous tissues, and muscles of the right armpit and the right anterior chest, and I recovered the pellet from the subcutaneous tissues of the right anterior chest. The path of this pellet, like the previous two, is back to front, right to left, and downward.

….

… [T]his [pellet caused] a grazing wound of [Tyler's] right shoulder. This is on the right lateral shoulder …. Graze wounds are very, very difficult to figure out which way they came from, so I listed the path as indeterminate.

*Id.* at 14-17. According to Dr. Luckasevic, three of the pellets traveled from "back to front, right to left, and downwards, so the shotgun blast had to come from a little higher than [Tyler]." *Id.* at 17. Dr. Luckasevic confirmed that the wound from Pellet C is consistent with the victim walking away, if the shooter was behind Tyler. *Id.* at 37. Dr. Luckasevic opined Tyler was over 10 feet away from the shooter when Tyler was shot. *Id.* at 38. However, Dr. Luckasevic acknowledged he could not ascertain the exact distance. *Id.* at 40.

Deane Sue Petzel (Ms. Petzel), an inmate at the Butler County prison, testified for the Commonwealth regarding her conversations with Appellant. *Id.* at 88. Ms. Petzel confirmed she is serving a sentence on federal charges, and is awaiting sentencing on Pennsylvania charges. *Id.* at 88-89. Ms. Petzel indicated she previously was Appellant's cellmate at the Butler County Prison. *Id.* at 90. According to Ms. Petzel, Appellant described to her Appellant's altercation with Tyler. *Id.* at 93. As described by Ms. Petzel,

[Appellant] was supposed to take Tyler to work around 4:00 or 4:30 in the morning, and when she got Tyler to work, there was nobody there. Tyler made a phone call to his boss, and nobody answered so [Appellant] told Tyler that she would need to wait until her father left the house … so that they would be able to go to her house.

… [Appellant and Tyler] went to [Appellant's] house after [her father] left for work. They slept, they had sex, they showered, they ate, and then [Appellant] had a conversation with somebody on the phone, and [Appellant and Tyler] got into an argument about that conversation.

When they got into an argument about that conversation, [Appellant] grabbed the gun from behind the couch. [Appellant] went out the door first, Tyler went out the door next, and he was walking away from her. [Appellant] hid behind the bush, [Tyler] started walking away; walking down the road, and … and at that time when she got a good aim at him, that's when she shot him.

[Appellant] turned around, took the gun back in the house, and got Tyler into the car. She saw that he needed help and got him into the car. Once she got him into the car, she started heading for the hospital, and she contacted [a friend named Jen] on the telephone. When Tyler fell forward, he hit the front of the dash. She got off the phone from talking with Jen, she called 911, and then that's where she pulled off at the [rodeo] grounds, and that's when all the help started coming to [Appellant].

*Id.* at 93-94. Ms. Petzel testified that she recorded her conversations with Appellant in a notebook. *Id.* at 95.

Ms. Petzel also testified that Appellant drew diagrams of the shooting for Ms. Petzel, which were admitted at trial. *Id.* at 97. According to Ms. Petzel,

[Appellant] drew the diagram, and she told me that the person with the long hair is her and the other person walking away was [the victim], and the bush was where she hid behind. [Appellant] knew that if she got behind the bush and she knew at a certain angle where he was that she would be able to shoot him from

- 12 -

there because she's been with guns all her life since the time she was five and had her own gun since she was seven. She knew she'd be able to hit him from there, and the gun that she picked up from behind the couch was a gun that she could kill with.

*Id.* at 97-98. Ms. Petzel testified that Appellant acknowledged she was a competitive shooter. *Id.* at 98. Appellant also stated she thought about throwing a grenade at the victim's family. *Id.*

Reading aloud her notes, Ms. Petzel testified that on April 19, 2023,

[Appellant] told me that she should have just taken [Tyler's] teeth out after she shot him, drove to Frank's[2] and put [Tyler's body] in the pig farm. No one would have ever found out since the pigs would eat all of him once the teeth are out.

4/20, "I have no remorse for killing [Tyler]. I didn't have to kill [Tyler]; you're the only person that knows the truth about me killing." I asked the question, "What do you mean?" [Appellant] said, "Hiding behind the bush, I did not need to kill him."

5/1 … The next time she told me that if she does anything like this, she'll do the pig farm thing.

5/8 "I'm trying to figure out how much time it will take for a grenade to go off once you pull it." Me, "Why?" "Enough time to run or have someone else do it. I could kill all of them."

5/9 pig farm ….

*Id.* at 100-01 (footnote added). Regarding the May 9, 2023, conversation, Ms. Petzel explained that Appellant again discussed "the same thing about the pig farms." *Id.* at 101.

On May 11, 2023, Appellant told Ms. Petzel that Appellant

---

[2] "Frank" is not identified in the transcript.

- 13 -

was five years old when she started with guns, and that at seven years old she had her own gun. "That's how I knew I could kill him."

5/12, "I knew exactly what I was doing; I did not have to kill [Tyler]. I hid behind the bush so I could kill him."

*Id.* at 101-02. On May 12, 2023, Appellant indicated she and Tyler had each had snorted one-half of a "boost bar." *Id.* at 102.

Ms. Petzel continued reading her notes of the conversations:

5/13, "I really don't care. They'll never give me more than four to four and a half years. I'm young and beautiful; people will feel sorry for me." Mother's [D]ay 5/14 she had a phone call with her dad between 8:00 and 9:00. Dad was trying to make her say that [the shotgun pellets] ricocheted off of a tree to hit [Tyler].

5/15 phone call a.m. with dad, 8:30 to 10:00; phone call a.m. with grandma trying to get [Appellant] to change her story. 5/16, "I can't believe Tyler is dead. Why would I do that? I was just so mad at him. I was so good to him." ….

*Id.* Ms. Petzel further identified a diagram, drawn by Appellant, which indicated that the victim was walking away from Appellant at the time of the shooting. *Id.* at 103.

The jury also heard a recording of Appellant's telephone conversation with her father, Jason Callahan (Mr. Callahan), while she was in jail. In the recording, Mr. Callahan drew Appellant's attention to a "chicken shit" pine tree located outside of their home. Commonwealth Exhibit 5 (1:36). Mr. Callahan suggested that the shotgun pellets might have been deflected by the tree. *Id.* (3:03). Mr. Callahan suggested, "that can be a totally - uh – an involuntary thing, you know?" *Id.* (3:43). Mr. Callahan inquired, "Is what I'm thinking

- 14 -

anywhere near right?" *Id.* (7:31). Appellant responded, "No." *Id.* (7:35). Mr. Callahan loudly advised Appellant that "this could fucking save you a lot of fucking time. Like many many many many years." *Id.* (7:43). He stated, "It could be the difference between 18 months or 18 years." *Id.* (8:29).

Appellant testified on her own behalf. Appellant acknowledged being proficient with firearms. N.T., 7/17/24, at 102-03. Appellant testified she has "a high female shooter [award] in sporting clays, three different awards for the same thing, and I have patches from my local trapshooting gun clubs." *Id.* at 103. Appellant admitted that she lied during her PSP interrogation. *Id.* at 104. She explained:

> I lied to the police officers because I was scared of going to jail, and I thought maybe making the situation different that I wouldn't have went to jail.

*Id.* at 107.

Appellant claimed that Tyler previously had accused her of being unfaithful with other men. *Id.* at 111. According to Appellant, on one occasion,

> Tyler went through my phone while I was sleeping, and he woke me up, and he was screaming at me and was calling me a whore and saying that I was with another man when that was not true. He threw my phone at me and then picked me up and threw me on the ground. I told him to stop and he did not.

*Id.* Appellant testified this occurred approximately two months before Tyler's death. *Id.*

Appellant further testified that during another argument, she splashed water on Tyler, after which Tyler threw a water bottle at her face, resulting in her having a bloody nose. *Id.* at 115. According to Appellant, this incident took place approximately a month prior to March 20, 2023. *Id.* at 116.

Appellant asserted that Tyler physically abused her:

There were numerous accounts of simple backhands or slaps, whatever you would like to call it, but there was also lots of arguments pretty much every day. We did not get along for the last few months. It was really rough, and [Tyler] was very manipulative….

*Id.* at 116.

Appellant testified that the night before the shooting, she and Tyler slept at the home of a friend, James Noblit. *Id.* at 136. During the evening, Appellant testified she and Tyler ingested crack cocaine. *Id.* at 136-37. The morning of March 20, 2023, at around 4:30 a.m., Appellant drove Tyler to his workplace, but no one was there. *Id.* at 137. After waiting 20 minutes, they left to go to Appellant's home, where she lived with Mr. Callahan. *Id.* at 138. Appellant and Tyler waited for Mr. Callahan to leave the home. *Id.* at 140.

Appellant and Tyler slept in the home until around noon. *Id.* at 141. Sometime after waking up, Tyler listened to a voicemail on Appellant's telephone, and became upset. *Id.* Appellant testified that

[t]here was a voicemail on my phone from Frank Servino saying that one of my friends was trying to get ahold of me; his name is Jamal.

Tyler listened to the voicemail because I don't want to hide it from him. He was upset because he does not like black people, and he called me a [expletive deleted] and was upset.

*Id.* Tyler remained in Appellant's room for "a few minutes," then stepped outside to smoke. *Id.* at 142.

Appellant testified that she spoke on the phone with a friend named Jen. *Id.* at 143. Appellant stated that Tyler overheard this conversation and became angry:

[Tyler] starts calling me names and yelling at me, and then he went to push me on the bed, and … I hit the bed, and then I hit my elbow off the dresser on the ground.

*Id.* at 144-45. Appellant testified she ran down the stairs, and Tyler ran after her. *Id.* at 145. Once downstairs, Appellant sat on the couch crying, and Tyler "came towards me, and he kept calling me names. Once he did that, I turned, and I grabbed the shotgun, and I ran outside my residence." *Id.* at 146.

Appellant testified as follows:

I went outside, and I ran. Outside of my door, the side door, I ran to the right, which is where the yard would be.

….

A few seconds after I came out of the house, [Tyler] came past me.

*Id.* at 147. Appellant denied hiding behind a bush, acknowledging "[t]here was a bush, but there was no way to hide behind it." *Id.* Appellant claimed that Tyler walked into the side yard "right in front of me." *Id.* at 148.

According to Appellant, Tyler kept "screaming" at her. *Id.* Appellant described what next transpired:

> [Tyler] was calling me names, and he began laughing at me. He was mocking me because I had the gun.
>
> ….
>
> And then … he started to walk towards the mailbox.
>
> ….
>
> [Tyler walked] away from me; he was walking away from me, and he came to turn around, and I got scared.
>
> ….
>
> And then I just shot.

*Id.* at 149. Appellant claimed she shot at a bush, but Tyler was past the bush. *Id.* at 150. Appellant emphasized, "I shot the bush. I did not shoot at him." *Id.* at 151.

Appellant testified that a shotgun shell found on the ground near the corner of the bush was "maybe the warning shot. I ejected the shell, but I can't tell you because I was so scared at that point in time." *Id.* at 151.

Appellant also presented the testimony of her father, Mr. Callahan. N.T., 7/18/24, at 32. Mr. Callahan explained that in his recorded telephone conversation with Appellant, "I wasn't trying to tell [Appellant] anything. I was basically asking if what I saw was what I thought I saw." *Id.* at 38. Mr. Callahan testified that he subsequently telephoned police regarding his observations. *See id.* Mr. Callahan testified that the tree or bush is located

approximately 20 yards from the mailbox on the property, at an angle. *Id.* at 40. Mr. Callahan testified regarding the downward slope from his residence to the road. *Id.*

This evidence, viewed in a light most favorable to the Commonwealth, is sufficient to sustain Appellant's conviction of third-degree murder. The evidence established that Appellant killed Tyler by using "a deadly weapon on a vital part of the victim's body." *Hicks*, 156 A.3d at 1124. The jury, as fact finder, was free to believe all, part, or none of the evidence. *Id.* at 1123. Even if Appellant had preserved her sufficiency challenge, we would conclude it lacks merit.

Appellant next challenges the trial court's failure to issue her requested jury instruction on involuntary manslaughter. Appellant's Brief at 17. In her brief, Appellant claims she requested the following jury instruction:

> Involuntary manslaughter encompasses "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty."
>
> *Commonwealth v. Mayberry*, … 138 A. 686, 686 ([Pa.] 1927). *See also Commonwealth v. Jones*, … 308 A.2d 598 ([Pa.] 1973); *Commonwealth v. Flax*, … 200 A. 632 ([Pa.] 1938).
>
> Where the act itself is not unlawful, to make it criminal, the negligence must be such a departure from prudent conduct as to evidence a disregard for human life or an indifference to the consequences.

> ***Commonwealth v. Feinberg***, … 253 A.2d 636 ([Pa.]
> 1969); ***Commonwealth v. Aurjck***, … 19 A.2d 920 ([Pa.]
> 1941). However, the proof of negligence to support a
> charge of involuntary manslaughter need not be proof of
> acts or omissions exhibiting reckless, wicked and wanton
> disregard of the safety of others. Negligence of that high
> degree will support a charge of murder in the second
> degree. … ***Commonwealth v. Aurjck***, … 19 A.2d at 924.
> ***See also Commonwealth v. Taylor***, … 337 A.2d 545
> ([Pa.] 1975).
>
> ***Commonwealth v. Stock***, [345 A.2d 654, 656-57] ([Pa.] 1975)
> [(emphasis omitted).].

Appellant's Brief at 17-18 (some quotation marks omitted).

Appellant argues she requested this instruction "because the facts of the case led to the conclusion that a negligent act, as opposed to a deliberate act, caused an untimely death." ***Id.*** at 18. According to Appellant,

> the very fact that a critical element of the defense was that it was
> an inadvertent or negligent act which was the cause of death,
> coupled with the Commonwealth's insistence that it was a cold-
> blooded killing with [Tyler] having been "shot in the back",
> glaringly highlighted the need for a more nuanced instruction on
> how the jury should view the issue of negligence in its
> determination.

***Id.*** at 18-19. Appellant argues,

> [w]hile the [c]ourt's pattern instruction accurately state[s] the
> law, it does not clearly set out for the jury how the possibility of
> negligence could play into their determination, given the
> uncontroverted facts that a 19[-]year[-]old woman, who was
> escaping an assault from her 31[-]year[-]old paramour, fired a
> warning shot, that ricocheted off of a tree and caused the death
> of [Tyler].

***Id.*** at 19.

The Commonwealth disagrees:

- 20 -

Appellant's proposed [instruction], where relevant, was redundant. Appellant's [proposed instruction], where irrelevant, would not have aided the jury. The charge for involuntary manslaughter was discussed at length in Chambers. (Trial Transcript, July 18, 2024, pp. 83:24 – 93:5). The trial court used the standard charge for involuntary manslaughter ….

Commonwealth's Brief at 25. According to the Commonwealth, Appellant's proposed jury instruction "would have included terms that were not mentioned in the trial and would not have aided the jury in its deliberations." *Id.*

"[O]ur standard of review when considering the denial of jury instructions is one of deference – an appellate court will reverse a [trial] court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Green*, 273 A.3d 1080, 1084 (Pa. Super. 2022) (citation omitted).

[A] jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [defendant] was prejudiced by that refusal.

*Commonwealth v. Becker*, 192 A.3d 106, 118 (Pa. Super. 2018) (citation omitted).

Our review discloses an in-chambers discussion regarding Appellant's proposed instruction. N.T., 7/18/24, at 84. The Commonwealth argued that

under the third-degree murder statute, "[i]t's immaterial whether it's a lawful or unlawful act. The same standard applies." *Id.* at 86.

The trial court ultimately agreed to suggestions proposed by Appellant's counsel:

> THE COURT: I will include with the standard charge, 15.2504, the language highlighted by [defense counsel] in my charge, and that will get plugged in – I'll put that in before subpart six, okay?
>
> [DEFENSE COUNSEL:] So between five and six?
>
> THE COURT: Yes, that's what I'll do.
>
> [DEFENSE COUNSEL:] Thank you, Judge.
>
> THE COURT: … So does that address to your satisfaction point number three?
>
> [DEFENSE COUNSEL:] Yes, it does.

*Id.* at 87.

However, Appellant also requested an additional charge, which would distinguish between a lawful and unlawful act, using the term "felony":

> THE COURT: … You want me to read, "Involuntary manslaughter encompasses the killing of another without malice and unintentionally but in doing some unlawful act **not amounting to a felony** or actually intending to cause death or bringing bodily harm or in negligently doing some act lawful in itself or by the negligent omission to perform a legal duty"; that would satisfy you as far as your requested point five?

*Id.* at 91-92 (emphasis added). Appellant's counsel agreed. *Id.* at 92. The Commonwealth objected, asserting that the word "felony" had not been used at trial, was not defined, and could confuse the jury. *Id.* The trial court

agreed. *Id.* The trial court denied the proposed charge, and stated it would issue the Proposed Standard Jury Instruction. *Id.* at 93.

The trial court's instruction stated the following:

… [A] Defendant commits involuntary manslaughter where he or she directly causes the death of another person by reckless or grossly negligent conduct. [Appellant] has been charged with involuntary manslaughter. To find [Appellant] guilty of this offense, you must find that the following three elements have been proven beyond a reasonable doubt:

First, that Tyler [] is dead, second that [Appellant's] conduct was a direct cause of his death, and third, that [Appellant's] conduct was reckless or grossly negligent.

The terms reckless and grossly negligent mean the same thing. A Defendant's conduct is reckless or grossly negligent when he or she is aware of and consciously disregards a substantial and unjustifiable risk that death will result from his or her conduct. The nature and degree of the risk being such that it is grossly unreasonable for him or her to disregard. In deciding whether [Appellant's] conduct was reckless or grossly negligent, you should consider all relevant facts and circumstances including the nature and intent of [Appellant's] conduct and the circumstances known to her.

As the definitions I just gave to you indicate, the recklessness/gross negligence required for involuntary manslaughter is a great departure from the standard of ordinary care. It is a departure that shows a disregard of human life or an indifference to the possible consequences of one's conduct. Compared with reckless[ness]/gross negligence, the malice required for third[-]degree murder is a more blameworthy state of mind. The essence of malice is an extreme indifference to the value of human life. **Involuntary manslaughter is found where the conduct causing death is either unlawful in itself or done with such a rash and criminally negligent manner as to be deemed reckless.**

This [c]ourt has frequently stated the degree of recklessness required where, as here, the act causing death may in itself be unlawful. To make it criminal, the negligence of the [Appellant]

- 23 -

must be such a departure from prudent conduct as to evidence of [*sic*] disregard of human life or an indifference to the consequences….

N.T., 7/21/24, at 151-53 (emphasis added).

In its opinion, the trial court addressed and rejected Appellant's issue:

As to [Appellant's jury instruction] claim, the only point requested by [Appellant] that the [c]ourt did not grant, specifically, or cover in another instruction to [Appellant's] counsel's satisfaction, was her request number 5, regarding involuntary manslaughter. Instead, the [c]ourt charged the jury pursuant to Section 15.2504 of the Pennsylvania Suggested Standard Jury Instructions (2024). The [c]ourt believes that this instruction provided the jury with a clear and correct statement of the law they were to apply, in determining whether [Appellant] was guilty of involuntary manslaughter.

Trial Court Opinion, 11/18/24, at 1.

Upon our review of the jury instructions, we discern no error or abuse of the trial court's discretion. Appellant's proposed instruction, which would distinguish actions constituting a "felony," where the term had not been used or defined during trial, could have caused the jury unnecessary confusion. The charge issued by the trial court, as a whole, was not inadequate or confusing. *See Becker*, 192 A.2d at 118. The trial court correctly instructed the jury regarding the applicable law. As such, Appellant's claim of error merits no relief and we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/22/2025